This Opinion Is a
Precedent of the TTAB

Mailed: June 20, 2019

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*In re The Cardio Group, LLC*

————

Serial No. 86840860

————

Jerry C. Harris, Jr. of Wick Phillips Gould & Martin LLP,
    for The Cardio Group LLC.

Laura Golden, Trademark Examining Attorney, Law Office 103,
    Stacy Wahlberg, Managing Attorney.

————

Before Kuhlke, Bergsman, and Hightower,
    Administrative Trademark Judges.

Opinion by Bergsman, Administrative Trademark Judge:

The Cardio Group, LLC ("Applicant") seeks registration on the Principal Register

of the mark THE CARDIO GROUP and design, shown below, for "retail store services

featuring medical devices," in Class 35. [1]

---

[1] Application Serial No. 86840860 was filed December 7, 2015, under Section 1(a) of the Trademark Act, 15 U.S.C. § 1051(a), based on Applicant's claim of first use anywhere and first use in commerce as of November 2, 2015.



Applicant describes the mark as follows:

> The mark consists of a depiction of a sinus rhythm waveform comprising THE CARDIO presented above the horizontal portion of the waveform and to the left of the R wave portion and GROUP presented below the horizontal portion of the waveform and to the right of the S wave portion.
>
> Color is not claimed as a feature of the mark.

Applicant disclaimed the exclusive right to use the term "The Cardio Group."

Applicant's original specimen consists of two items, "web page captures of device, functions and services" and a "confidential sales agreement." An excerpt from the "web page captures of device, functions and services" is displayed below:

**THE CARDIO GROUP**

**PHYSICIAN GUIDE PWA (PULSE WAVE ANALYSIS)**

| | | | |
|---|---|---|---|
| Last Name: Doe | First Name: John | ID: 222222 | Date of Service: 01/12/15 |
| DOB: 07/29/1969 Age: 44 | Gender: Male | Height (in): 68.00 Weight (lb): 270.00 | Physician: Doctor Name |
| Diagnosis: SOB | Race: Caucasian | | Tech: Technician Name |
| Tobacco Product: Never Smoked | How Long (pk/yrs): | Years Quit: | |
| Medications: Metformin, Simvastatin | | | |

The "confidential sales agreement" is displayed below:



## CONFIDENTIAL SALES ADDENDUM

Max Pulse Device

Dedicated Toshiba laptop
(software is pre downloaded)

Four Month Unconditional Money Back Guarantee

All Future Software Upgrades
Upgrades every 18 months, $1,000 upgrade fee is waived

Training & Certification
Jump drive that includes all training materials

3D Artery Model

No More Heart Disease by Dr. Louis Ignarro

100 Max Pulse Patient Education Brochures

Waiting Room Brochure Stand

Custom Digital Marketing Campaign

Melissa Larsen

**VP OF NORTH AMERICAN SALES**

**CLINICIAN NAME**

*[signature]*

**SIGNATURE**

**CLINICIAN SIGNATURE**

11/2/2015

**DATE**

**DATE**

The Examining Attorney refused registration under Sections 1 and 45 of the Trademark Act, 15 U.S.C. §§ 1051 and 1127, on the ground that the specimens do not show Applicant's mark in use in connection with retail store services.[2] She explained that neither of the original specimens refers to retail store services.[3] In the September 29, 2016 response, Applicant submitted an additional specimen, the sales invoice shown below.

---

[2] April 1, 2016 Office Action.

[3] *Id.* at TSDR 2. All citations contained in the Trademark Status & Document Retrieval (TSDR) database are to the downloadable .pdf format of the documents.



**THE CARDIO GROUP**

| CONFIDENTIAL SALES AGREEMENT DATE: November 2, 2015  2015 | | Melissa Larsen VP of North American Sales The Cardio Group  2707 Cole Ave Suite 127 Dallas, TX 75204 Office: 214.770.4934 |

**BILL TO:**                                          **SHIP TO:**

| ITEM # | DESCRIPTION | QTY | PRICE/VALUE |
| --- | --- | --- | --- |
| MP 7609 | Max Pulse Device | 1 | $10,500 |
|  | All future software upgrades |  |  |
|  | Dedicated Laptop | 1 |  |
|  | Four Month Unconditional Money Back Guarantee |  |  |
|  | Sales Addendum Inclusions |  |  |
|  |  |  |  |
|  |  | TOTAL DUE | $10,500 |

Credit Card #: _____

Exp: _____  Security Code: _____  Billing Zip: _____

Name on Card: _____

Signature: _____

The Examining Attorney issued a final refusal explaining that "applicant has submitted business documents showing that applicant is engaged in selling products. However, these documents do not indicate that such sales are made at retail stores."[4]

According to Section 45 of the Trademark Act, 15 U.S.C. § 1127, a service mark is used in commerce "when it is used or displayed in the sale or advertising of services and the services are rendered in commerce." *See also* 37 C.F.R. § 2.56(b)(2). "To

---

[4] October 3, 2016 Office Action (TSDR 2).

determine whether a mark is used in connection with the services described in the [application], a key consideration is the perception of the user." *In re JobDiva, Inc.*, 843 F.3d 936, 121 USPQ2d 1122, 1126 (Fed. Cir. 2016) (citation omitted). The question is whether the evidence of Applicant's use of its mark creates an association between the mark and Applicant's retail store services. *Id.*

"Specimens showing the mark used in rendering the identified services need not explicitly refer to those services in order to establish the requisite direct association between the mark and the services, but 'there must be something which creates in the mind of the purchaser an association between the mark and the service activity.'" *In re Way Media*, 118 USPQ2d 1697, 1698 (TTAB 2016) (quoting *In re Johnson Controls, Inc.*, 33 USPQ2d 1318, 1320 (TTAB 1994)); *accord JobDiva*, 121 USPQ2d at 1126 ("the question is whether the evidence of JobDiva's use of its marks sufficiently creates in the minds of purchasers an association between the marks and JobDiva's personnel placement and recruitment services") (internal quotation marks, brackets, and citation omitted).

For specimens showing the mark in advertising the services, "[i]n order to create the required 'direct association,' the specimen must not only contain a reference to the service, but also the mark must be used on the specimen to identify the service and its source." *Way Media*, 118 USPQ2d at 1698 (quoting *In re Osmotica Holdings Corp.*, 95 USPQ2d 1666, 1668 (TTAB 2010)).

Showing only the mark with no reference to, or association with, the services does not show service mark usage. *In re Adair*, 45 USPQ2d 1211, 1214-15 (TTAB 1997);

*In re Duratech Indus. Inc.,* 13 USPQ2d 2052, 2054 (TTAB 1989). Thus, an acceptable specimen must show "some direct association between the offer of services and the mark sought to be registered therefor." *In re Universal Oil Prods. Co.,* 476 F.2d 653, 177 USPQ 456, 457 (CCPA 1973).

The webpage specimen appears to be a "pulse wave" analysis report for a fictitious patient. This specimen presents the results of an analysis from a medical device. The specimen does not refer to any activity that may be considered a retail store service.[5]

The "confidential sales addendum," identified by Applicant as a "confidential sales agreement," and which was part of the original specimen, is an addition or appendix to a sales contract. While it evidences a hypothetical sale, it does not indicate how that sale was made (i.e., it does not show that the sale was made through a retail store as distinguished from (e.g., a sale made through a personal sales call or visit)). Likewise, the substitute specimen identified as an invoice but labeled "confidential sales agreement" is a sales contract and does not refer to any activity that may be considered a retail store service. While the two documents may evidence a November 2, 2015, transaction involving the sale of a medical device, they do not reveal, for example, how the goods were, if at all, advertised, brought to the attention of, or sold to a customer.[6] Thus they do not evidence advertising that the goods were available

---

[5] "Retail store services are considered a service under the Nice Agreement because the activities of a retail establishment that surround the sale of goods do provide a benefit to others, e.g., the bringing together, for the benefit of others, a variety of goods (excluding the transport thereof), enabling customers to conveniently view and purchase those goods." Retail Store Services Note 035-1089 in the ACCEPTABLE IDENTIFICATION OF GOODS AND SERVICES MANUAL.

[6] The documents do not reference an actual customer, even in redacted form.

via retail store services. More generally, these documents reflect product sales. They do not indicate that any service, in any form, was provided.

Both precedent and examination guidance make clear that in assessing the specimens, consideration must be given not only to the information provided by the specimen itself, but also to any explanations offered by Applicant clarifying the nature, content, or context of use of the specimen that are consistent with what the specimen itself shows. *See In re Pitney Bowes, Inc.*, 125 USPQ2d 1417, 1420 (TTAB 2018); *In re DSM Pharms., Inc.*, 87 USPQ2d 1623, 1626 (TTAB 2008) ("In determining whether a specimen is acceptable evidence of service mark use, we may consider applicant's explanations as to how the specimen is used, along with any other available evidence in the record that shows how the mark is actually used."); *see also* TRADEMARK MANUAL OF EXAMINING PROCEDURE (TMEP) § 1301.04 (October 2018) ("[A] specimen description submitted by the applicant typically helps clarify the manner in which the mark is used in commerce, and the more explanation the applicant provides initially, the more helpful it is to the examining attorney's analysis. Thus, applicants are encouraged to provide a specimen description and explain how the applicant renders or provides the services … ."). Here, Applicant explains that the services it renders are in the nature of activities provided by a retail store: that is, Applicant is selling products. In other words, "'retail store services' includes those types of services that a consumer might expect from a retail store" and

those activities do not have to take place in an actual retail store.[7] Applicant's explanation fails to clarify that the specimens show Applicant rendering a retail store service of any type or persuade us that there is an association between THE CARDIO GROUP and design and retail store services.[8]

In response to the refusal, Applicant additionally attempted to amend the description of services from "retail **store** services featuring medical devices" to "retail **sales** services featuring medical devices."[9] Applicant concludes that the sales addendum and invoice show use of THE CARDIO GROUP and design in connection with retail sales services.

> Accordingly, since more than "sales services" can occur in retail stores (e.g., returns, advice, repairs, etc.), limiting the description to only "sales services" narrows the scope of the description from the former all "store services." Applicant respectfully notes that "retail" is defined as "to sell in small quantities directly to the ultimate consumer," see https://www.merriam-webster.com/dictionary/retail. Accordingly, the instant specimens indicate that a single medical device (with its ancillary accessories) are [sic] sold to an ultimate consumer (i.e., the purchasing clinician). Based on the foregoing, Applicant respectfully submits that the instantly provided specimens indicate that the claimed mark is used in "retail sales services featuring medical devices."[10]

---

[7] Applicant's Brief, pp. 9-11 (4 TTABVUE 10-12); Applicant's Reply Brief, pp. 6-7 (7 TTABVUE 7-8).

[8] Retail store services may be offered in various ways, such as through physical locations ("brick and mortar"), catalogs or online. Applicant's specimens do not suggest any of these.

[9] March 8, 2017 Request for Reconsideration (TSDR 2).

[10] *Id.* In her April 18, 2017 Office Action, the Examining Attorney refused to accept the proposed description of services because "retail sales services" exceeds the scope of "retail store services. The Examining Attorney correctly noted that

> Applicant has argued that this is a narrowing of the identification of services, but it is exactly the opposite. Indeed,

As best we understand the argument, Applicant is simply restating that its specimens reflect a product sale. But as mentioned above, evidence of a product sale is not evidence that retail store services are or were provided.

Applicant further explained to the Examining Attorney that "the sales addendum indicates that a 'Max Pulse Device' … is being sold by applicant as a service under the relevant mark."[11] According to Applicant, the confidential sales agreement "indicates that a 'Max Pulse Device' … is being sold by applicant as a service under the relevant mark for $10,500."[12] Applicant concludes

> Both specimens reveal that the applicant, at the time of the filing of the application, was providing retail store services featuring medical devices under the claimed mark for, at least the reason, that Merriam-Webster indicates that a retail store is "a place of business . . . in which merchandise is sold primarily to ultimate consumers." As is evident from the specimens, the claimed mark indicates the place of business (The Cardio Group) which is providing the medical device sales services (e.g., selling medical devices) to the ultimate consumers (e.g., the purchasing clinician).[13]

Applicant's argument is based on the false premise that because a retail store is a place of business and Applicant both has a place of business and is selling medical devices, ipso facto, Applicant is selling medical devices from a retail store. There

---

> this change was specifically made to broaden the identification of goods, so that the previously unacceptable specimen of use would show use of the mark with services distinct from those initially identified in the application.

*Id.* at TSDR 2.

[11] October 17, 2017 Response to Office Action (TSDR 2).

[12] *Id.*

[13] *Id.*

simply is nothing in the documents submitted by Applicant that refer to a retail store (of either the on-line or brick-and-mortar variety) or create an association of any kind between THE CARDIO GROUP and design and a retail store service.

Considering all the specimens in their totality and the explanations regarding how Applicant renders its services and uses its THE CARDIO GROUP and design mark, we find no direct association in any of the specimens between THE CARDIO GROUP and design and any type of retail store service. Nothing in these documents demonstrates that consumers would perceive THE CARDIO GROUP and design as a source indicator for retail store services. Ultimate consumers who choose to purchase Applicant's products very well may understand they are engaging in a retail sales transaction with Applicant, but even if this is assumed, it would not establish that such consumers, prior to making their decision to make such a purchase, were exposed to any advertising or promotion of Applicant as the operator of a retail store selling medical devices.[14]

**Decision**: The refusal to register Applicant's mark THE CARDIO GROUP and design is affirmed.

---

[14] The ultimate consumer, a clinician in Applicant's characterization, may have been referred to Applicant by a third party or in some other way have engaged with Applicant, as through a direct sales agent, in discussion of its medical devices.